in his official capacity as Secretary of U.S. Department of Health and Human Services. Mr. Rissler for the appellant, Ms. Neumeister for the appellate. Counsel for appellant, you may proceed. Good morning. May it please the court, Jared Rissler for appellant. I'd like to reserve one minute for rebuttal. This case concerns the application of two cost-cutting measures. The Budget Control Act and the aggregate hospice cap. Applying each according to its plain language is straightforward. The Budget Control Act requires a 2% reduction to quote, individual payments for services. The hospice cap statute applies to the aggregate quote amount of payment made by Medicare for a one-year period. The two provisions here can both be applied according to their plain language. There's no conflict in reducing individual payments for services by 2% as required by the Budget Control Act and then applying the aggregate cap to the hospice's aggregate amount of payment made as required by the hospice cap statute and the agency's published interpretations of it. In fact, that's exactly what the Medicare contractors initially did in this case. The agency wasn't satisfied with that outcome and in March 2015, it secretly instructed the contractors to change the way that they applied the hospice cap. The effect of these instructions was to apply sequestration to the hospice's aggregate payments rather than to their individual payments for services made as Congress had instructed. Now the Secretary observes that if we tweak the language of the Budget Control Act, if we apply the 2% reduction to hospice's aggregate payments rather than their individual payments for services as Congress instructed, then this will result in the maximum possible savings for, or maximum possible recoupments from hospices and thus the greatest savings for Medicare. But the Secretary has not identified any language in the Budget Control Act that applies the 2% reduction to anything other than individual payments for services. And you will search in vain to find such language. Can I ask you something about that? It says individual payments for services furnished during the one-year period. Now these payments that you got, were any of those for services across a one-year period or were they for smaller periods of time? All of the payments, that's a good question. Those are individual payments that were issued for claims submitted for specific services. Were they for services that were furnished during a one-year period? Or for a shorter period? Well, the individual payments, no, are, they're Herbian payments. And so, what happens with hospices is And aren't they made monthly? Are they made monthly? They are made monthly, that is correct. Pursuant to claims that are submitted for services at a daily rate. As well, the one-year period that's referenced in the Budget Control Act is the one-year period starting with the order for sequestration, which in this case would be April 1 to March 31. The aggregate hospice cap applies to an entirely different time period from, excuse me, from November 1 to October 31. Can I ask Go ahead. The amount made of payment for the services ultimately is the reconciled amount of payment, not the payments that are made as through the year as the services are being rendered. There's no question that the legally required payment is the reconciled payment at the end of the year. Isn't that right? Well, the only payment that is made to a hospice are these Herbian payments. Those payments are, the amount of payment made under the language of the statute are subject to an aggregate cap. But there are providers that receive interim payments, and where that happens there are regulations governing the interim payments. Those interim payments occur when providers are paid on a cost-reporting basis. In the ordinary case, when there are payments being made, per diem payments being made monthly so that the providers have a cash flow, there's no determination of what amount the providers are actually entitled to until the cap is determined after the fact and applied. And so when you're talking about payments made as a sort of literal matter, payments are made. They're disbursed, but they're not payments that are to which the providers are legally entitled for the services that they provided until the reconciliation has happened under the cap. Isn't that correct? Well, the amount of payment made under the hospice cap statute may not exceed an aggregate cap. And so the amount of payment made, and this is it's in the statute, but I think it becomes even more clear with the Secretary's interpretation or implementation of that statute in 42 CFR 418.3 AD and then even more so in CMS's manual that makes clear that the aggregate cap is applied by comparing the amount of payment made, the manual calls it total actual Medicare payments, to an aggregate cap. Can I ask you about your reading of 906 D3B? Because that, since the Budget Control Act can apply, quote, on a basis relating to the reasonable cost incurred for the services during a cost reporting period of the provider. When you look at the payments received by hospice during a cost reporting period, isn't that doesn't that already include the aggregate cap? No, the hospices are not paid according to a cost report. The per diem payments are final payments. They're not reconciled based on costs incurred. And so there is no Well, no, there's the application. At the end of the year, there's the application of the aggregate cap, and there may be other adjustments, if I understand this scheme. So there is a form of reconciliation that happens at the end. It may be tailored to your situation, but your payment for the cost reporting period is determined at the end of the year through the reporting process. And that process includes application of the aggregate cap, right? Yes, there is. The per diem payments are not final payments, because if they go over the aggregate cap, you'll have to return some. Well, the per diem payments are subject to an aggregate cap, which is over a period of November 1 to October 31. Right, over a year. So all I'm trying to do is clarify what's meant by payments over a cost reporting period. And that would include in the hospice. I'll tell you my understanding, if you can tell me where I'm wrong, because you understand this better than I do, it's pretty complicated. But my understanding is that cost reporting period, the year time, the 12 months you mentioned, you have the per diem payments, but then at the end of that, there's a final reckoning as to the payments and that there can be adjustments. And part of that process includes application of the aggregate cap and any adjustments that need to be made because of that. Is my understanding correct? Well, with one caveat, I think the language for the cost reporting period is coming from the Budget Control Act. I'm not sure that that language is in it is not in the hospice cap aggregate cap statute. That period is referred to as the cap period, as opposed to a cost reporting period because hospices are not paid on cost. And that aggregate cap is calculated against net reimbursements. Other adjustments are made as the secretary acknowledges in its briefing at pages 44 and 45. The aggregate cap is applied after other adjustments. And the secretary offers no reason why sequestration should be treated differently than other adjustments. So does that cost reporting language report apply to a different part of the Medicare Act? Is that what you're saying? That doesn't apply to the hospice provision? I think that's right. Hospices are not paid on a cost reporting basis. They do have an aggregate cap that applies. It's not, strictly speaking, a reconciliation because they are not paid on a cost reporting basis, but they do receive a notice of final reimbursement that applies the aggregate cap. Okay, so you're saying, I just want to make sure I understand. I don't want to use your mouse to tell me if I've got it wrong. You're reading of the language I quoted from 906 D3B is when they're referring to cost reporting periods that's different aspects of the Medicare Act, maybe hospitals, because they go through a cost reporting process and hospices do not. That's right. Okay, thanks. Sorry. No, you go ahead. No, no. I was just going to ask how you square the way you would propose reading the statutes to time the calculation of the sequestration with the explanation example that the district court provided at JA 249 at page 10 of the slip opinion that shows that your method wouldn't apply the sequestration to hospice B, which was the less efficient hospice and would apply it to hospice A. That seems contrary to the budget control mandate to reduce the Medicare spending by 2% across the board, and it just seems perverse to reward the less efficient provider that way. First, the hospice cap is not a matter of efficiency. Hospices cannot avoid the cap by being more efficient. The hospice cap is a comparison of two numbers, an aggregate cap, which is determined by essentially the number of Medicare beneficiaries that a hospice serves and the amount of payment made, which in a per diem system is the amount of the number of days of services being provided. And so a hospice that exceeds its cap did not necessarily provide services inefficiently. It merely provided more services than the, compared to the number of patients on its census. Essentially, it comes down to its length of service and the argument of efficiency is essentially one that patients remained on hospice too long or lived for too long. It has nothing to do with the hospices spending too much providing care. I'm not sure I follow. It sounds like you're arguing with the policy behind the cap. Are those examples incorrect in the district court's opinion? I thought they were illuminating and to the extent that the cap would apply to the one that spent more and not to the one that spent less, it seems like you're saying, well, that's an erroneous or misled policy choice. No, that's not it at all. The hospice cap applies to, we're not questioning the application of the hospice cap. So take, for example, a hospice with an aggregate cap of $98,000 with sequestration in effect, that hospice would need to deliver $100,000 of services in order to exceed the cap. And so this notion that hospices that exceed the cap have avoided sequestration is not correct. Those hospices have had, as the Budget Control Act requires, their individual payments for services reduced by 2%. So there may be services above the $100,000 in that situation. Hospices continue to provide services. It paid its nurses, paid its chaplains, its social workers, its administrative staff. It continues to pay for patients' medications, and it continues to submit claims, and those claims are paid at 98%. The effect of the cap is that those payments made above the cap have to be returned. And so the notion that hospices avoid the cap, or excuse me, avoid sequestration because they're subject to a second further cut under the hospice cap statute simply is not the case. There are other adjustments that are made to hospices' payments that the Secretary of Briefing admits those adjustments must be made before application of the aggregate cap. And so take a hospice that had $100,000 of payments but that are reduced by $5,000 for Medicare secondary pay and $10,000 for the inpatient cap. That hospice then has net payment of $85,000. If the hospice's aggregate cap is $70,000 that hospice is paid $70,000 regardless of, which would be the same even if the Medicare secondary payer and the inpatient cap had not applied. And the Secretary acknowledges that that is the right of resolve even though one could make the same argument that by applying the aggregate cap after those adjustments the hospice has essentially avoided those pre-cap cuts. I'm not sure I'm understanding this right. Wouldn't that money that was taken off in advance that 2% off the per diems, wouldn't that have come off in the end anyhow because that 2% would have been part of what would have been over the aggregate cap anyhow? So it wasn't really sequestration. I know it was called sequestration but financially it's no different than if they had simply somehow been able to see under crystal ball and cut back based on the aggregate cap early. I mean you would have lost that same money due to the aggregate cap. I think that's what I thought the District Court was saying and so that's my question. You wouldn't have gotten it anyhow. So I think in the example of being able to see under the crystal ball, let's take the example of the hospice that has a $98,000 cap. And let's pretend that we could see under the crystal ball and Medicare could simply cut off payments at the point that the quote amount of payment made exceeds $98,000. In a sequestration year that provider would provide $100,000 of services that would then be paid at $98,000. At the point after that is where you would cut off payments. Under the Secretary's position, the payments cut off not at actual amount of payment made of $98,000 but at 2% less than that. I don't see that. I mean on your example which I see at page 10 of the District Court's opinion, the 2% sequestration in Table 2 per Gentiva's argument leaves the final amount retained by Hospice B at $1,000, not $980,000. And I thought you just said that assuming that it should come out the same way if we had a crystal ball and that under the crystal ball scenario, Hospice B would retain $980,000. Is that not what you were saying? So in column A of the District Court's example, the actual payments which is the $980,000 the $1,000 reduced by 2% is less than the aggregate cap of $1,000. This doesn't kick in for that. That's right because the and under our view, that's the correct result for the $1,000. But what about under column B? I thought you were saying that if they were paying and knew as they went along that the cap was going to be $980,000 that they wouldn't pay beyond that amount. And so the result should be even if they did mistakenly pay beyond that, the result should come out that the final amount retained by the Hospice is in column B $980,000 as well. But you're saying no. No, the final amount in column B should be $1,000 because the actual payments made after sequestration are the $1,176. But I thought if we equate what should happen with what would happen if we had the crystal ball and knew what the cap was going to be, then CMS wouldn't have paid $1,176 but would only have paid $980,000. If we had the crystal ball and the aggregate cap was $1,000, Medicare would have stopped paying $1,000. And because of sequestration, it was down to $980,000. Right.  If the aggregate cap was $1,000 and the amount that would have been paid in the absence of sequestration is this $1,200. So those payments, those individual payments for services that together add up to the aggregate amount of $1,200 would have been reduced by 2% at each claim. And at the point that those sequestration reduced payments, the amount of payment made equaled $1,000, it's at that point that Medicare would have stopped paying. So the $1,000... What I was trying to say is the amount that was sequestered in those individual payments, the sort of per diem payments, the $824, if I have my math right, between $1,200 and $1,176 in column B, you weren't going to get to keep that money anyhow, just because of the aggregate cap. They took it out and called it the advanced sequestration, but you were never going to get that money anyhow because of the aggregate cap. So counting that as your sequestration payment is sort of double counting for you. You're not actually paying any sequestration, you're just not getting money that you were never going to get anyhow. And so that's why they had to take another 2% off at the end to make sure that for hospital B, hospital B and hospital A share the pain equally and both actually end up getting 2% less than what they would have gotten at the end of the year when everything is sorted out, which would have been $1,000 max. Well, hospice B receives payments that are reduced by sequestration during the year. And according to the Budget Control Act, these are the individual payments for services. They are reduced. In order to get to the $1,000 cap in a sequestration year, that hospice needs to provide services that are worth more than $1,000. They provide $1,000 plus the 2%. And those individual payments for services that otherwise would have been made at say $1,020 are made at $1,000. And any payments above that are subject to the hospice cap. Why is the hospice cap raised for a hospice that doesn't have sequestration? It seems like the cross check for whether sequestration has occurred has to be that no hospice is able to pay more than another hospice and more and as much as they would have had without sequestration. And it sounds like they may be getting less per service, but they're allowed to provide and get reimbursed for more services by effectively having a higher cap. And I guess you were saying before why you think that's consistent with the notion of the dual application of the cap and sequestration, but it's not at all intuitive to me why a hospice that does more services for more patients thereby gets effectively a higher cap. Well, providing more services does not create a higher cap. The cap is created by statute, is calculated by a per beneficiary amount times the number of Medicare beneficiaries. So that cap amount is not adjusted upwards for hospices that provide additional services or have additional costs. That is purely a fixed number that applies to every single hospice across the board. So it's an amount that's set every year. In this case it was I believe 26,157.50. And that number is multiplied by the number of beneficiaries that the hospice serves. And that's the same across the board for every hospice. Hospices that are below the cap retain all of their payments. They don't get any additional payment because they stay below the cap. They retain all of their payments, sequestration reduced payments. And the hospice that is above the cap has its sequestration reduced payments further reduced. They've already received a 2% sequestration during the year. That's taken out of their payments before the contractor sends the money to the hospice. So they've already had that 2% taken out. My point was is that that 2% they thought was going to be a sequestration payment in fact didn't because it was just enforcing the aggregate cap. In reality it was money what I don't understand is if that's money you were never going to get anyhow because of the aggregate cap. You weren't going to get the 200 under the 1200 theory and you weren't going to get the extra 824 that they took out because of the 2% sequestration. That was never going to be your money anyhow because of the aggregate cap. Are we agreed on that? That 824 difference between 1200 and 1176 was never going to be money that the hospice has got to keep even if there were no sequestration. Is that right? That is essentially the same argument as... I'm just asking a fact question. Is it right? I'm sorry. Am I right in understanding that the 824 that was taken out here in a normal year I guess you would have gotten your 1200 in per diem payments under hospice B in this column. It said you only got 1176 so that's an $824 difference. Those are tiny amounts and they aren't the right amounts but you were never going to get that money anyhow even without sequestration you wouldn't have got that money. Without sequestration then the aggregate cap would have required the provider to return everything in excess of $1000. Right. So that 824 that they took out just because they were trying to get ahead on the sequestration thing for the hospitals that overpaid in fact it ended up not really being a sequestration payment at all because it wasn't anything sequestered as to that hospice's payments because they were never going to get that money. So at the end of the year they had to go wow hospice B you haven't contributed anything to the sequestration process. You still want to get your full 1000. We have to pay the sequestration. Everybody has to feel the sequestration pinch the same and that's all they did here with you. So it's not really... I understand they call them sequestration payments during the year but in fact the reason they went through the calculations they did is that for hospices that were over the cap those so-called sequestration cuts during the year were in fact not enforcing sequestration. It turns out all they did was enforce the cap a little bit earlier than normal. Well sequestration according to the Budget Control Act applies to individual payments for services and Medicare in implementing the sequestration cuts instructed the Medicare contractors to apply sequestration to individual claims for services. And that's precisely what was done. My factual understanding is accurate as to this table in the math that the 824 that you lost to so-called sequestration was in fact not money the hospice lost at all. It was never going to get to have that money or keep it in the first place because it was over the cap. And so then it seems like you're just going to your textual argument which I understand about individual payments in 906D but then those payments weren't for services furnished during the one year period. Because they weren't final as to that until we got to the end of the year and everything got its final reckoning. The payments, the only payments the hospice receives are the individual payments referred to the per diem. But you don't receive them and you don't keep them if they're over the cap. So there has to be a reckoning at the end of the year. And they figure out how much of those checks we sent you during the year in fact were for services furnished during that year consistent with law under the statutory scheme. Under the hospice cap statute? The 906D1A is talking about all of A and B of the Medicare Act. And so it's looking much more globally. There's no specific provision here for the hospice statute. It's all of A and B. And that is statutory schemes that require an end of the year reckoning. Your reckoning is a bit different than say hospitals do for the reasons you've explained very well. But at the end of the day, they're talking about payments over a one year period. That's one reading of the statute. And that's when the payment, that payment you received, say you got, I can't do the math, but you got $200 for a one month payment. I know these are very small numbers compared to reality, but my brain can't do the bigger numbers. $200 for a month, but it turned out that you're only entitled under the statutory scheme to $150. That $50 of that was actually going to be over the cap anyhow. And so that wouldn't be difficult to say that that $200 payment rather than $150 you really should have gotten because of the cap is what Congress was referring to when it talked about individual payments for services furnished during the one year period. I don't think that the amount of payments remaining after application of the aggregate cap can be characterized as individual payments for services, which was the specific language that Congress chose as the means for implementing the Budget Control Act. It has broader language that goes towards the goals, but as this court has previously explained, it's for Congress to choose the means for implementing its goals and the means and language that Congress used was individual payments for services. Excuse me, go ahead. The aggregate cap applies to an entirely different amount, which is the amount of payment made by Medicare for an aggregate one year period. And so the issue with the hospice having any hospice that is above the cap after adjustments, whether those adjustments are sequestration, Medicare secondary payer, or inpatient cap, any hospice that after those reductions remains above the cap is going to get paid or is going to retain payments at the cap. All right, counsel, I think we have your argument, and this is somewhat repetitious in your responses to Judge Millett. I think I was repetitious in my questioning. Well, maybe so, but I mean, we're not covering new ground here. I think we get your argument. Why don't we hear from counsel for Apolli, and then we'll give you your minute for rebuttal. Thank you. So, counsel for Apolli. Thank you, Your Honor, and may it please the court, McKay Newmeister for the government. I'd like to start by taking a step back and focusing on what this case is about. The plain text of the Budget Control Act required a 2% reduction to Medicare spending, which can only be achieved for hospice payments if applied after the aggregate cap, which is precisely what the agency did here. Jantiva's view of the statute, by contrast, would exempt them from the effects of sequestration entirely. Well, they, I'm sorry, they argue that it wouldn't, that you're basically getting a bargain on each and every service provided because as the payments are made throughout the year, they're made at a 2% discount for all of them. So, in the aggregate, the government will get more services for the capped amount than it would without sequestration, and that itself, I gather, appellant is saying, is a saving to the government. It's not, though, Your Honor, because if you look at the amount that Jantiva would be entitled to receive for the aggregate services that it provided over the course of the entire year, with or without sequestration, under its approach, that amount is the same. And so, the total outlays from the Medicare program for that year have not been reduced at all to these hostesses that are exceeding their caps. Right, and my understanding of their position is, yeah, but they have to work harder and provide more value to get there. Well, Your Honor, we're... So, you're getting more product at a discount. I think that's his position. Yeah, Your Honor, the way that this works is that the hostesses have to provide the services that are required under the statute regardless of what is going to happen at the end of the day. These individuals, if they're eligible for hospice benefits, are entitled to keep receiving those benefits, even if the hospice provider is not properly controlling its costs, and those costs go over the cap. And so, it's not that the government is receiving more bang for its buck. The government will receive the same amount of services, or rather, these benefits, either way. But the aggregate cap is a cost control measure, and Congress implemented it to ensure that the costs that were being paid for hospice care didn't exceed what the government would otherwise be paying for a conventional care setting for those same patients. And so, these hostesses are supposed to control their costs, keep their aggregate costs under this cap for the year, and under Gentiva's approach, we have an incongruous result whereby hostesses that are properly controlling their costs and keeping them below the cap are subject to the full effect of sequestration and bear the brunt of these cuts, whereas the hostesses that are not controlling their costs and are going over the cap don't end up seeing any reduction at all for the year. And that's what the district court referred to as the difference between an efficient hospice and an inefficient hospice. And it's perverse. It creates a perverse incentive, Your Honor, for these hospices that are not controlling their costs. It actually creates upward pressure that would incentivize them to shade over their aggregate cap to make sure that they can actually keep more in reimbursement for the year in order to avoid the full effects of sequestration. If that's indeed the statute that's enacted, it would be very surprising because rather than reducing Medicare spending for hospice care by 2% across the board for a significant percentage of hostesses, there would be no overall reduction at all, and hostesses would face this upward pressure that I discussed to actually increase costs instead of decreasing them, which is what both of these measures intend to happen. Thankfully, that's not the statute that Congress enacted, though, as the district court correctly held. I'm going to ask you about 906 D-3B that talks about cost reporting, period. And Mr. Reisler said that doesn't apply to hospices because they don't do cost reporting certainly in the way that many other Medicare participants do. Do you agree that 3B doesn't apply to them on that basis, or do you believe that hospices do file cost reports? Your Honor, I'm not exactly certain whether the agency treats 3B in particular as applying to hospices, but I will explain what happens with hospices with respect to what you would consider to be a cost report. Cost reports are a term that's used generally to apply to hospitals, and they have a cost reporting period, and they file cost reports at the end of the year. If you look at 42 CFR 405.1803, this is the regulation titled Contractor Determination and Notice of Amount of Program Reimbursement. It talks about the end of the year. What page are we on? The regulation is 405.1803. Let me just find that in the addendum really quickly. I believe it's in the addendum. Yes, it's A16 of the addendum to our brief. This regulation applies to the end of the year process by which various providers are issued a determination of their overall reimbursement, the overall notice of program reimbursement that they are entitled to receive for the year. This applies both to hospices and to hospitals that have a cost reporting period. As the notice explains, there's cost reports that are filed by other entities, but at A3, it mentions the hospice caps, and it says that with respect to a hospice, the reporting period is the cap year. It's essentially indicating that what you would call cost reporting periods for other entities, that's the cap year for hospices, and a cost report for other entities is essentially this process of filing their self-determination of cap amount that the hospices have to follow. I believe that's under 418308C. I want to point you to one other source, Your Honor, and that's the provision for PRRB review. That's 139500. Let me find that in the addendum as well. Let's see. A4 is 139500, I believe. The most relevant provision is not included in this, Your Honor. If you actually look at the first provision of that, it's A, establishment, and it talks about the review of the PRRB, and it says that any provider of services which has filed a required cost report may obtain a hearing with respect to such cost report, but that also applies to hospices. They don't technically file what's defined as a cost report. They file these cap notices. They self-determine their caps, and that's ultimately what they get to challenge through the PRRB, which just demonstrates that it's a different term, but it has certain similarities, and as the questioning, my friend on the other side, revealed there are reasons why these cost reports, sorry, not cost reports, there are reasons why the total amount of program reimbursement to a hospice at the end of the year differs from the amount of payments that are paid out as periodic reimbursements throughout. One other thing about this Budget Control Act in D1A, the language that they're relying on, the budget control act, which has a sort of understanding within the hospice system because of the way it works with the premium payments, but Congress there was speaking about parts A and B of the Medicare Act, which is a lot of ground to cover, so when you talk for a hospital, is the term payments for services or individual payments for services used, or does it what was it meant to cover, and how do we know that, given that it was an umbrella term for everything that happens under A and B? So in the context of hospices, Your Honor, you read the language of this provision, individual payments for services, but it needs to be read with a view to its context and its place in the overall statutory scheme. So you read it in light of the rest of the structure of the Budget Control Act, and you also read it in light of the nature of the program statute. So for hospices, that's 1395 F.I.1 and F.I.2, and you can see that in context payments to hospice providers are treated in the aggregate for an entire year based on all of the collective services that an individual provider has provided for that year. So in this context, individual payments for services means the payments to the individual providers. Yeah, I think I was trying to ask a different question. And that is, say for a hospital, right, so we're under a different part of Part A here. We're talking about hospital payments, or B. Where in the process for hospitals, which get paid based on, if I recall, past cost estimates, and then everything gets adjusted at the end, what in that process counts as an individual payment for service? Where did Congress get this phrase, individual payments for services? They must have talked to somebody at HHS. I'm not exactly certain, Your Honor. I know that these are generally referred to as fee-for-service claims, so it's possible that they're in Part A and Part B, so they're thinking about in terms of services. The concept of individual payment amounts has been part of the special Medicare rules since it was first enacted in 1985. This provision was first enacted in 1985. And I know that the PRRB in talking about this explained that for a certain segment of hospitals, the agency applies sequestration essentially the same way that it does for hospices. And that's a footnote in the preliminary payments, and then again at the end? I believe that's correct, Your Honor. On JA13 and its note 64, it's talking about hospitals exempt from the inpatient prospective payment system and explains that these hospitals are subject to sequestration in a manner similar. I'm not exactly sure what the details of that are, Your Honor. But sort of stepping back, regardless, the way that this provision should be read. I know how you guys want to interpret it, but I'm just asking. There's no language in other parts of Medicare A or B that uses a phrase like payment for service or individual payments for services. That's not a statutory term that appears somewhere? I'm not aware of a statutory provision that uses the phrase individual payments for services that Congress might have been meaning to invoke here. If you look at the Medicare statute specifically for hospice payments, the relevant provision is titled payment for hospice care and talks about how payment for hospice care works and how services should be viewed and how payments go to on the basis of individual providers. But regardless of the specific Medicare program that you're talking about, the way to interpret individual payments for services is to look at the way that that program functions and then the way that Congress structured the rest of the Budget Control Act. I just want to know if for hospitals and whoever else is covered under Medicare A and B, is sequestration applied at the end of the year after all the reconciliation has been done to ensure that each hospital, each participant, whatever form they take is paying its share of the sequestration? That's certainly what the footnote that I pointed to in the PR of the decision suggests for hospitals that are exempt from the inpatient prospective payment system. I'm not certain. That's a small number. I'm not certain what other systems are in place that CMS has used to implement this. We do have the upfront 2% reduction for fee-for-service claims under Part A and Part B and then obviously the technical direction letter was issued here specifically about how to do this for hospices. I believe there is other similar directives for other programs, for instance, the IPPS exempt that I just referenced, but I'm not certain. Okay. Can you speak briefly to the notice objection? Yes, Your Honor. Ultimately, the agency was implementing sequestration under the Budget Control Act. It had to implement sequestration such as to achieve this 2% reduction after the aggregate cap. Because it was subject to this mandatory requirement, any potential procedural mechanisms that might otherwise apply aren't to the contrary. But in any event, the hospices were informed about how this would work by their contractors. The technical direction letter instructed contractors to issue a listserv telling hospices how this would be applied. There was also a forum that was held in November of 2014 at which they were made aware of this. That's referenced offhand at JA 213 Note 1 is where that's referenced in this record. Ultimately, because the Budget Control Act has this mandatory statutory directive that required this result, that was putting providers on notice about how this would ultimately work. Are there other examples of situations like that where the directive comes straight from Congress and so there isn't really room for the agency to implement through notice and comment rulemaking? It just has to apply? Are there other examples that you can point us to where there isn't that sort of more hand-holding kind of individualized notice to these actors? I don't have a specific example of that, Your Honor, but I will note that the District Court found that plaintiffs had not identified any reliance interests that were not being respected here. We raised that in our brief as well in the context of whether there had been any prejudice in the rule of prejudicial error and in reply, plaintiffs still have not identified any prejudice that they might have suffered based on just the timing of awareness of this policy. Indeed, it's supposed to be a reduction in sequestration is a reduction in overall spending. It's a reduction in these programs and so something being applied at the back end when the caps can be properly calculated. It's not surprising that there would not be prejudice from this. Does the government have a view on whether enforcement of its view of how the Budget Control Act was supposed to work here? So just for this question, assume that you're right on the merits. Whether that enforcement, that cutting that 2% that Congress said everybody has to do at different levels, but everyone has to cut counts as a sanction for which ascertainable certainty is even the right standard. So we explained in our brief, Your Honor, why this isn't quite the right fit based on the precedence that plaintiffs cited about fair notice because this really is not in general, not the kind of requirement that's being directly imposed on them that they're being penalized for violating. So just on sort of a general conceptual level, this isn't quite a match. I don't have a specific answer about your sanction question. It's not that they've violated, the aggregate cap takes care of any, if we can call it a violation, but we'll just say spending more than we're going to pay for. But enforcement sequestration is not a response to an individual provider's behavior or failure to conform to statutory regulatory requirements in the way that a sanction would be. This is just a share the pain all around. It is meant to be sort of an across the board cut that's applied evenly across programs with Medicare getting a special limited reduction. And another way to think about it that I think is sort of similar is that the question about fair notice is about whether CMS is imposing requirements and interpreting its processes to impose certain requirements. But here we have this independent statutory mandate from the Budget Control Act that independently applies and requires this result. And so, again, there's just the mismatch between saying that an agency didn't give fair notice of something that was independently required by Congress through statute. Thank you. Anything further? No, Your Honor. If there are no further questions, we would ask this court to affirm. All right. Thank you. Thank you, Your Honor. Just quickly on two points. The government said that there's an incentive to be inefficient and to exceed the cap. Hospices that exceed the cap have to return the amount of payment made in excess of the cap. There's no benefit at all to exceeding the cap. Hospices decidedly have an incentive not to exceed the cap because every penny that they receive above the cap has to be returned. And that's true regardless of sequestration or no sequestration. So there simply is no incentive to be inefficient or to exceed the cap. Briefly on the notice issue. We agree that there was no need to provide notice of the 2% reduction to individual payments for services. That was required by statute. But what the agency did in implementing it, they changed their interpretation of the hospice cap statute. That had been interpreted in implementing regulation and in the Medicare benefit policy meeting. And the instructions that it issued to the contractors. Where had they previously interpreted how the aggregate cap worked in conjunction with the Budget Control Act for sequestration requirement? Where had they previously done that? They had not, Your Honor, not to that level of specificity. But they did interpret the hospice cap as applying to total actual Medicare payments. Which is the net reimbursement in each hospice provider's statistical and reimbursement report. And the new interpretation changes that broad understanding of the hospice cap statute. And that was a change that required notice under 1395HH. Thank you. Go ahead, counsel. I mean, Judge Pillard. I was just going to confirm that I think the point is that there would be an incentive to very slightly exceed the cap. Because on the delta of services provided above, in case A, above 980, would in that instance not be effectively capped. So it's an incentive, I think, counsel, for the government said to sort of skate right above, edge right above the cap. Yeah, it's a precision type of incentive. But an incentive nonetheless, in her view. Anything further? Thank you. Thank you, counsel. Thank you, Your Honor. We'll take the case under advisement.
judges: Rogers, Millett, Pillard